George H. Stevens, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued February 8, 1979, before Judges WILKIN-SON, JR., MENCER and CRAIG, sitting as a panel of three.

*Taylor Aspinwall,* for appellant.

*Daniel R. Schuckers,* Assistant Attorney General, with him *James Bradley,* Assistant Attorney General, and *Gerald Gornish,* Attorney General, for appellee.

OPINION BY JUDGE CRAIG, July 13, 1979:

George H. Stevens, claimant, after being discharged from his position as a stationary engineer with the Osteopathic Hospital, was denied unemployment compensation by the Bureau of Employment Security, by a referee following a hearing and by the Unemployment Compensation Board of Review (Board), which affirmed the referee's denial upon appeal.

Compensation was refused on the basis that the discharge was for "willful misconduct," which, of course, disqualifies a claimant under Section 402(e) of the Unemployment Compensation Law.[1]

In affirming the denial of compensation, the Board found that claimant was discharged for "misappropriation of hospital property."

A summary of the events of the case is as follows: Claimant had a good work record for three years as a

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897 *as amended,* 43 P.S. §802(e).

night engineer at the hospital, in charge of boilers, chillers and emergency maintenance, including elevator matters. Although he was given certain hospital keys, by general rule he was not among those authorized to have an elevator by-pass key. Nevertheless, he was frequently called upon to obtain and use such a key, to take the elevator off by-pass when housekeeping workers and others left the elevator in that condition. His foreman gave him an elevator by-pass key.

Apparently because of his complaints that housekeeping personnel were leaving the elevator in by-pass status, he was called in by the Director of Personnel, flanked by outside legal counsel, and told not to complain. Claimant thereupon volunteered to have duplicate elevator by-pass keys made for the Head Housekeeper and for the Director of Personnel, who said that his duplicate should be given to the lawyer.

Claimant therefore had duplicates made of the key given him by his foreman and delivered one duplicate in an envelope to the Head Housekeeper and another in an envelope addressed to the Director of Personnel and the lawyer, by leaving the latter envelope with the Captain of Security.

It is puzzling that the presentation of duplicate keys to hospital superiors, including the head of the security department itself, should be regarded as misappropriation of property.

However, we note that claimant straightforwardly admitted the general rule that he was not authorized to possess a by-pass key.[2]

---

[2] The testimony does not indicate that the rule on possession of keys was a written rule. When asked if claimant was aware of the "Hospital Policy," the assistant personnel director said: "Ah . . . the Hospital, (inaudible) the misappropriation of Hospital Property, the . . . as published in our Work Rules and Regulations, which each Employee has received a copy of." This fragmented testimony suggests that only a rule against misappropriating hospital property was published in writing.

As was pointed out in *Holomshek v. Unemployment Compensation Board of Review,* 39 Pa. Commonwealth Ct. 503, 395 A.2d 708 (1979), the employer has the burden of proving the existence of a rule and the fact of its violation, but an employee, if attempting to justify a violation, has the burden of establishing good cause under the doctrine of *Frumento v. Unemployment Compensation Board of Review,* 466 Pa. 81, 351 A.2d 631 (1976).

There is no question but that the employer here met the burden of proving the existence of the rule, as admitted by the claimant, and its reasonableness has not been contested.

Because the Board found against claimant, who had the burden of proof on the matter of good cause for the violation, our scope of review on that point is to determine whether the Board capriciously disregarded competent evidence. *Unemployment Compensation Board of Review v. Atlantic Richfield Co.,* 22 Pa. Commonwealth Ct. 511, 349 A.2d 496 (1975); *Lebanon County Board of Assistance v. Unemployment Compensation Board of Review,* 16 Pa. Commonwealth Ct. 558, 332 A.2d 888 (1975). We have defined capricious disregard of evidence as a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching the result. *Unemployment Compensation Board of Review v. Atlantic Richfield Co., supra; Aluminum Company of America v. Theis,* 11 Pa. Commonwealth Ct. 587, 314 A.2d 893 (1974).

Claimant's basis for his position that he had good cause to depart from the rule was that he was given special approval by a superior official, the Director of Personnel, to do exactly what he volunteered to do—have duplicates made for his superiors.

Hence, one question is whether or not the Board capriciously disregarded competent evidence estab-

lishing that position. There is also a question as to whether or not supplying duplicate keys to superiors constitutes the misappropriation of property, so as to amount to willful misconduct.

It is significant to note that the fact of special approval not only stands upon claimant's uncontradicted testimony (the personnel director did not testify), but was also bolstered by the testimony of the assistant personnel director corroborating that claimant carried out those instructions in exactly the way he claims they were given.

The assistant personnel director, testifying as the employer's representative, described claimant Stevens' disposition of the duplicate keys, which he had procured, as follows:

> EMPL. REP.: Mr. Stevens had one key in an envelope addressed to Mr. Paul Ward, I have both copies of these envelopes, and their contents.
>
> . . . .
>
> EMPL. REP.: The first envelope was addressed to Mr. Paul Ward, Housekeeping Supervisor, (inaudible) Mr. Ward handed this key to Mr. Juliana, his Supervisor, and it was forwarded to the Personnel Office.
>
> . . . .
>
> REFEREE TO EMPL. REP.:
>
> Q: Alright. Now who turned them in to . . .
>
> A: Mr. Juliana handed, turned in the key, addressed to Mr. Paul Ward, and the second envelope was addressed to Mr. Tomlinson, who was the Director of Personnel and Mr. Hatoff, who was our Legal Counsel. Ah . . . it says, 'You requested a copy of the letter sent to your Paul Ward. Here it is. I hope it meets with your approval. Sincerely, your colleague, George H. Stevens.'

This was handed, ah . . . it came through the mail. To my secretary.

The above passage is consistent with claimant's testimony concerning the special approval, which was as follows:

Q: And did you have any meeting after that with Mr. Tomlinson, because he spoke to Captain Anderson, about having the Key?

A: I did. Mr. Tomlinson called me in and said that Mr. Paul Ward didn't appreciate my complaining to Captain Anderson about him having this Key, and it happened twice and . . . ah . . . I told . . . I explained to Mr. Tomlinson how it happened . . . I . . . ah . . . said I can . . . write him a little note, I said . . . 'Perhaps he is right, he should have a Key,' I said, 'I will have a Key made for him,' and, 'I will send it to him.' and Mr. Tomlinson said, 'Well, send me a copy,' 'NO,' he said, I think he said, 'Send it to Mr. Hatoff.' And maybe he didn't mention it, but I asked Mr. Hatoff, I said, 'What is your name and address,' 'I will send you a Copy;' and he looked at Mr. Tomlinson, and Mr. Tomlinson said, 'You can give it,' or give him one of your cards;' and Hatoff gave me one of his cards, it was, 'Hatoff . . . ah . . .'

Thus the undenied testimony describes the special permission given by the Director of Personnel, saying as to the duplicate key, ". . . send me a copy . . ." and then, curiously, directing that the duplicate be sent to the lawyer from the hospital's law firm. (Although claimant indicated that he suspected entrapment for the purpose of eliminating an aging employee, that point was not pressed.)

The background of claimant's interview with the Director of Personnel was that claimant had been called "a couple of times a week" by the Director of

Security and by security guards to use a by-pass key to restore elevator service. He also related that the elevator at times had been left out of service (through use of a by-pass key) by housekeeping personnel, whose supervisor, according to claimant, also borrowed the by-pass key.

When asked how he had obtained a by-pass key, claimant testified that his foreman, one Mortimer Mahoney, issued it to him.

Claimant steadfastly testified that his admitted violation of the general rule was with the knowledge and approval of superior officials. Although claimant appeared to be confused as to the relative meanings of authorization and approval, his account is basically clear, as follows:

EMPL. REP. TO CLAIMANT:

Q: Mr. Stevens, who authorized you to duplicate the Key?

A: No one. I took that upon myself. I met one of the highest Officers in the Hospital, who knew what I was doing, and who approved it, which he approved of, . . . I also . . . put it into Captain Anderson, the Head of Security, . . . and Captain Anderson said nothing about it.

Q: But no one authorized you to duplicate the Key?

A: No one . . .

. . . .

EMPL. REP. TO CLAIMANT:

Q: Did anyone authorize you to distribute the Keys? To Mr. Paul Ward and Mr. Tomlinson?

A: I would say that Mr. Tomlinson did. Because I told him what I was going to do. I thought it was a nice gesture, in as much as Mr. Paul Ward was upset that he couldn't have the Key and being an Executive. . . .

None of this evidence was countered by the Director of Personnel or the lawyer, neither of whom appeared. Although even uncontradicted testimony need not be accepted, there is here specific corroboration by the employer's witness that the duplicate keys were not misappropriated, but were dutifully and openly delivered by claimant, in one case with a covering note, to the head of security as well as to the Director of Personnel.

One could hardly believe that this claimant would have delivered the duplicate keys to the head of Security and to the personnel director (whose office later demonstrated the power to fire him) unless he had a basis for believing that he was acting properly in doing so. Reliance upon the approval of such officials is reasonable; an employee at claimant's level could hardly be expected to insist upon confirmation of such approval by the hospital administrator or the board of directors.

Hence, to conclude that claimant misappropriated keys is to disregard the evidence that the duplicates were delivered to superiors, not converted, and that possession of the original key was openly acknowledged to such superiors—which acknowledgement was implicit in the delivery of the duplicates. These points are clear even if claimant's testimony is discounted and only the testimony of the employer representative accepted.

Moreover, claimant's demonstrated willingness to supply duplicate keys to his superiors (apparently at his own expense) certainly was not an "act of *wanton* or *wilful* disregard of the employer's interests" nor did it manifest *"culpability, wrongful intent,* or *evil design"*—as we have defined willful misconduct. *MacFarlane v. Unemployment Compensation Board of Review,* 12 Pa. Commonwealth Ct. 550, 552, 317 A.2d 324, 325-26 (1974). (Emphasis in original.)

We therefore reverse the decision of the Board and remand for the computation and award of compensation.

ORDER

AND Now, this 13th day of July, 1979, the order of the Unemployment Compensation Board of Review, dated November 4, 1977, denying benefits to George H. Stevens, is reversed, and the case is remanded for computation and award of benefits.